UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| SHAVON TYVELL BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:15-CV-082 RLM |
| v. | ) | |
| | ) | |
| COMMISSIONER, INDIANA | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Shavon Tyvell Boyd, a *pro se* prisoner, was granted leave to proceed against Chaplain Richard Ungrodt under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a), and the First Amendment for denying him the right to pray in the chapel and celebrate Chanukah in 2014 at the Westville Correctional Facility. Chaplain Ungrodt has filed a motion for summary judgment (ECF 94), in which he asserts that Mr. Boyd's RLUIPA claims are moot and his First Amendment claims should be dismissed as a matter of law. Chaplain Ungrodt also contends that, to the extent that he violated Mr. Boyd's rights, he is entitled to qualified immunity.

As a preliminary matter, two additional motions are before the court. Chaplain Ungrodt filed a motion to strike, and Mr. Boyd submitted a motion for oral argument.

## I.  Motion to Strike

Chaplain Ungrodt moves to strike portions of Mr. Boyd's declaration (¶¶ 9-11, 13, 15, 16, 24-25, 27, 30-31, 33-35, 42, 48) and Kelvin Underwood's declaration on the basis that they contain matters that are inadmissible and unsubstantiated."An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The court denies Chaplain Ungrodt's motion to strike these declarations on the basis that they contain inadmissible and unsubstantiated evidence. Motions to strike are usually only granted when the contested evidence causes prejudice to the moving party. Kuntzman v. Wal-Mart, 673 F.Supp. 2d 690, 695 (N.D. Ind. 2009). That is not the case here. When ruling on the motion for summary judgment, the court is capable of sifting through the evidence, arguments and purported disputes under the applicable federal rules and case law, giving each purported dispute the credit to which it is due. Therefore, there is no need to strike the affidavits based on admissibility concerns.

Chaplain Ungrodt also moves to strike portions of Mr. Boyd's declaration on the basis that it contradicts Boyd's prior sworn testimony. Id. "Parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict prior depositions." See Bank of Ill. v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1996); see also Beckel v. Wal-Mart Assocs.,

Inc., 301 F.3d 621, 624 (7th Cir. 2012). According to Chaplain Ungrodt, Mr. Boyd tried to create a genuine issue of material fact by submitting a declaration that he met with Chaplain Ungrodt as early as October 2014 to discuss his desire to celebrate Chanukah. Chaplain Ungrodt points out that Mr. Boyd testified during his deposition that he first met with Chaplain Ungrodt about Chanukah in November or December of 2014. Chaplain Ungrodt argues that Mr. Boyd's declaration contains "blatant falsehoods," "egregious[]...and arguably libelous statements," and contends that Boyd is guilty of "[f]alsifying evidence to secure a court victory..." Chaplain Ungrodt argues that dismissal of Mr. Boyd's case with prejudice would be an appropriate sanction for his transgressions. Id. Respectfully, the court disagrees.

As a threshold matter, in his deposition Mr. Boyd did state that he wrote to Chaplain Ungrodt in October 2014. While this meeting might not have been about Chanukah, it was about his religious concerns. Thus, while Mr. Boyd's statement in his declaration is likely mistaken, there seems to be no falsifying evidence on the part of Mr. Boyd. Moreover, it is unnecessary to strike Mr. Boyd's statement. Even without considering the statement that he met with Chaplain Ungrodt in October 2014 to discuss Chanukah, there is still evidence in the record that Mr. Boyd sent him numerous letters in November 2014 for that very purpose. Ultimately, there is no need to strike Mr. Boyd or Mr. Underwood's declarations. The court denies Chaplain Ungrodt's motion.

## II. Motion for Oral Argument

Mr. Boyd asks for oral argument on Chaplain Ungrodt's motion for summary judgment. To be entitled to an oral argument the requesting party must explain why it is necessary. See N.D. L.R. 7-5. Mr. Boyd requests oral argument largely out of concern that his written filings are illegible, but his submissions have been neat and articulate. Mr. Boyd also says he could call witnesses to testify, but under the court's local rules, parties are not permitted to present additional evidence at this stage in the proceedings. N.D. L.R. 7-5(a)(3). Oral argument doesn't appear necessary and Mr. Boyd's motion will be denied.

## III. Motion for Summary Judgment

### *A. Factual Background*

Mr. Boyd, a Jewish inmate within the Indiana Department of Corrections, was incarcerated at the Westville Correctional Facility during the events complained of in this lawsuit. In December 2016, Mr. Boyd was transferred to the New Castle Correctional Facility.

Mr. Boyd claims that in November 2014, he sent Chaplain Ungrodt a letter asking to celebrate Chanukah. Mr. Boyd sought to observe Chanukah by lighting candles on a menorah. Mr. Boyd claims that he informed Chaplain Ungrodt that a rabbi would provide the facility with a menorah that he could use to observe the holiday. Mr. Boyd testified that he wrote Chaplain Ungrodt another letter on December 3, 2014 about Chanukah. Mr. Boyd sent Chaplain Ungrodt more

requests regarding his observance of Chanukah dated December 10, 2014 and December 14, 2014. Chaplain Ungrodt received these requests on December 16, 2014. Chaplain Ungrodt denied both requests on the basis that he couldn't accommodate the request because it was too late to obtain the necessary supplies. Chaplain Ungrodt also said that Department of Correction policy required such services to be led by an outside volunteer and required more than one inmate participate. Mr. Boyd contends that he contacted Chaplain Ungrodt "at least 5 times prior to the December 10, 2014 request for interview." Sometime in early December 2014, Mr. Boyd had Officer Canady speak with Chaplain Ungrodt about his need for religious accommodations. Officer Canady told Mr. Boyd that Chaplin Ungrodt wasn't going to accommodate his religious needs and that Chaplain Ungrodt also referred to Mr. Boyd as a "Jewish nigger."

Mr. Boyd also spoke with Chaplain Ungrodt in person on December 14 or 15, 2014 about his observance of Chanukah. Chaplain Ungrodt contends that this face-to-face meeting was the first time Mr. Boyd contacted him about Chanukah. The parties don't dispute that Chanukah began on December 16, 2014.

Mr. Boyd also contacted Chaplain Ungrodt about access to the prison chapel. Mr. Boyd sent Chaplain Ungrodt a letter dated November 20, 2014 seeking permission to pray in the chapel. Chaplain Ungrodt responded that there was insufficient security staff available to supervise Boyd's prayer in the chapel. Two other staff members relayed similar requests to Chaplain Ungrodt that they received from Mr. Boyd. Chaplain Ungrodt maintained his position that there was

insufficient staff to supervise a private prayer session.

## *1. Standard of Review*

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010).

## *2. Discussion*

### *a. RLUIPA*

Mr. Boyd asserts that Chaplain Ungrodt not allowing him to pray in the Westville Chapel and celebrate Chanukah in December 2014 violated his rights under the Religious Land Use and Institutionalized Persons Act, which provides in pertinent part:

> No government shall impose . . . a substantial burden on the religious exercise of a person residing in or confined to an institution . . .

> unless the government demonstrates that imposition of the burden on that person—
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). A "substantial burden" on religious exercise is "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise. . . effectively impracticable." Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003). RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety . . . [and] an accommodation must be measured so that it does not override other significant interests." Cutter v. Wilkinson , 544 U.S. 709, 722 (2005). Courts must apply RLUIPA "with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Id. at 723. While RLUIPA can be used to obtain injunctive relief, it doesn't provide a cause of action for money damages against state prison officials. Sossamon v. Texas, 131 S.Ct. 1651 (2011).

Mr. Boyd is no longer incarcerated at Westville. He doesn't provide any evidence or argument that he will return to Westville. As a result, Mr. Boyd's injunctive relief claim against any official at Westville is moot and must be dismissed without prejudice. See Higgason v. Farley, 83 F.3d 807, 811 (7th Cir. 1995) ("If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred."). Mr. Boyd acknowledges that his injunctive relief

7

claim is moot, but goes on to request declaratory relief under RLUIPA. Mr. Boyd wasn't granted leave at the screening stage to proceed on any RLUIPA claim seeking declaratory relief. For these reasons, the court grants Chaplain Ungrodt's motion for summary judgment with respect to Mr. Boyd's RLUIPA claim.

*b. First Amendment Claims*

Unlike his RLUIPA claim, Mr. Boyd's First Amendment claims haven't become moot. Mr. Boyd argues that his First Amendment claims should be analyzed under the RLUIPA framework, but he is mistaken. Inmates are entitled to broader religious protection under RLUIPA than they are under the First Amendment. Holt v. Hobbs, 135 S. Ct. 853 (2015).

Prisoners enjoy a right to exercise their religion under the First Amendment. Vinning-El v. Evans, 657 F.3d 591, 592-593 (7th Cir. 2011). This right is "subject to limits appropriate to the nature of prison life." Id. Restrictions that limit the exercise of religion are permissible if they are reasonably related to legitimate penological objectives, including security and economic concerns. Turner v. Safley, 482 U.S. 78, 89–91 (1987); Ortiz v. Downey, 561 F.3d 664, 669 (7th Cir. 2009). The Supreme Court has fashioned a four-factor test to determine whether a reasonable relationship exists between the challenged regulation and a legitimate penological interest. Turner v. Safley, 482 U.S. at 89. First, there must be "valid, rational connection" between the questioned regulation and the "governmental interest put forward to justify it." Id. The second factor asks whether there exist alternative ways for the prisoner to exercise the right. Id. at 90. Third, a court

should consider the impact that accommodation of the prisoner would have on guards, other inmates, and "on allocation of prison resources generally." Id. Fourth, "the absence of ready alternatives" on the part of the prison administration is strong evidence that the regulation is reasonable. Id.

Chaplain Ungrodt isn't entitled to summary judgment on either of Mr. Boyd's First Amendment claims.

*i. Observance of Chanukah*

Chaplain Ungrodt argues that Mr. Boyd's request was untimely. Chaplain Ungrodt says he first received notice of Mr. Boyd's request on December 15, 2014, one day before the start of Chanukah. He argues that because there wasn't adequate notice, he didn't have time to gather unspecified supplies necessary to accommodate Mr. Boyd's request. Furthermore, Chaplain Ungrodt's counsel points to a Department of Correction policy requiring the participation of more than one prisoner in a service led by an outside volunteer. The defense argues that no other inmate had requested a similar service, so no volunteer had been obtained.

Mr. Boyd claims that Chaplain Ungrodt had advance notice of his request because he wrote Chaplain Ungrodt several letters in November and December about his desire to celebrate Chanukah. Mr. Boyd also had Officer Canady speak with Chaplain Ungrodt about this before December 15, but the chaplain indicated (according to Mr. Boyd) that he wouldn't accommodate Mr. Boyd's religious needs. Mr. Boyd contends that the facility had adequate supplies to accommodate his

request because he had donated a menorah to the facility in November. Chaplain Ungrodt doesn't specifically address these arguments.

Chaplain Ungrodt's primary justification for denying Mr. Boyd's request was the lack of advance notice and supplies necessary to accommodate the request. The trier of fact must resolve these factual disputes to determine whether Chaplain Ungrodt's denial satisfies the Turner balancing test. There might have been reasonable security concerns that justified the denial of the request. For example, one can imagine that there is a reasonable penological interest in prohibiting open flames within the prison. See Childs v. Duckworth, 705 F.2d 915, 921 (7th Cir. 1983) ("It is manifest that candles present a fire hazard…Consequently, it was a sensible and reasonable precaution for the authorities, in the interest of prison security and the safety of the inmates and staff, to impose supervision on the use of candles and incense in the chapel and to deny inmates their use in individual cells"); Kaufman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2005) ("an inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests"). Yet, Chaplain Ungrodt's denial was not based on the facility's security concerns, but rather his inability to accommodate an untimely request and a lack of "adequate supplies." Factual questions preclude the granting summary judgment in favor of Chaplain Ungrodt.

*ii. Access to the Prison Chapel*

Chaplain Ungrodt seeks summary judgment because he denied Mr. Boyd's

request based on reasonable staffing and security concerns. A prison may reasonably restrict private prayer sessions on the basis of staffing concerns. See Richards v. White, 957 F.2d 471, 474–475 (7th Cir. 1992) (inmate's request for 30 minutes of uninterrupted prayer time in the chapel was unreasonable in light of administrative burden on prison); Al-Alamin v. Gramley, 926 F.2d 680, 686 (7th Cir. 1991) ("Both security and economic concerns are legitimate penological demands. Prison administrators, like most government officials, have limited resources to provide the services they are called upon to administer"). Prisons have a strong interest in "having its guards observe prisoners at all times and in all situations." Canedy v. Boardman, 91 F.3d 30, 34 (7th Cir.1996).

Yet Mr. Boyd's claim goes further than merely challenging his own access to the chapel. Rather, he argues that Christian prisoners were permitted private prayer sessions in the chapel, but prisoners of other faiths were not. Mr. Boyd submitted an affidavit from a fellow prisoner, Kelvin Underwood, who claims to have worked in the chapel every day for 19 months. Mr. Underwood's affidavit says he "personally witnessed offenders pray and worship in the G.S.C. chapel without supervisor or custody staff. This happened every day that [he] worked for 19 months." Mr. Underwood claims that Chaplain Ungrodt told him that he couldn't pray in the chapel because only Christians were permitted to pray in the chapel. Mr. Boyd contends that Chaplain Ungrodt told him the same thing when he asked why he could not use the chapel. He claims that Chaplain Ungrodt told him that only Christians could pray in the chapel, and that all other prisoners had to pray in the auditorium.

While the United States Constitution doesn't require prison and jail officials to provide a special chapel or place of worship "for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand," Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), any restriction on religion must be applied evenly to inmates of all faiths. Kaufman v. Pugh, 733 F.3d 692, 696 (7th Cir. 2013) ("the Establishment Clause may be violated even without a substantial burden on religious practice if the government favors one religion over another [or religion over nonreligion] without a legitimate secular reason for doing so").

Chaplain Ungrodt doesn't dispute, or even address, this aspect of Boyd's claim. If Christians were permitted to pray in the chapel but prisoners of other faiths were not, there might have been a reasonable penological interest behind the policy. See Burns v. Buncich, No. 2:12-CV-034, 2017 WL 1347046, at *7 (N.D. Ind. Apr. 11, 2017) ("It is 'not constitutionally impermissible for Defendants to consider the demand and need of the group requesting the chapel, along with space and staffing limitations, when deciding where religious groups will conduct their services'") (quoting Baranowski v. Hart, 486 F.3d 112, 123 (5th Cir. 2007)). But because Chaplain Ungrodt does not address this claim, a genuine dispute of material fact remains. For these reasons, Chaplain Ungrodt's motion for summary judgment with respect to Mr. Boyd's First Amendment claims is denied.

### c. Qualified Immunity

Chaplain Ungrodt argues that if he committed a constitutional violation, he

is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quotation marks and parallel citations omitted). A two-part inquiry determines whether the defense applies: (1) whether the facts alleged by the plaintiff show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. Id. This doesn't require inquiry into the defendant's subjective intent; tThe question is one of "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." Harlow v. Fitzgerald, 457 U.S. at 818. So to decide whether Chaplain Ungrodt has qualified immunity, the court must determine "the currently applicable law," as well as "whether that law was clearly established at the time an action occurred." Id. "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Id.

Mr. Boyd alleges that Chaplain Ungrodt arbitrarily denied him the opportunity to observe Chanukah sufficient notice of his request, and that Chaplain Ungrodt intentionally denied him access to pray in the chapel based on his religious beliefs. If Mr. Boyd's version of events is true, Chaplain Ungrodt's actions violated the clearly established law. As the cases cited in the prior sections

of this opinion demonstrate, in 2014, no reasonable prison official could have believed that it was legal to arbitrarily deny a prisoner access to religious observance, or to intentionally discriminate against a prisoner based on the prisoner's religious beliefs. Chaplain Ungrodt hasn't demonstrated that he is entitled to qualified immunity.

## IV. Conclusion

For these reasons, the court:

1. DENIES the motion to strike (ECF 108);

2. DENIES the motion for oral argument (ECF 100); and

3. DENIES IN PART the summary judgment motion (ECF 94), denying it with respect to Mr. Boyd's First Amendment Claims, granting it with respect to Mr. Boyd's RLUIPA claims.

SO ORDERED.

ENTERED: May 10 , 2017.                    /s/ Robert L. Miller, Jr.
                                           Judge
                                           United States District Court